Barry Kirschner Law, LLC
2205 E. Speedway Blvd.
Tucson, AZ 85719
Phone 520-849-7771
Fax 520-849-7773
Barry Kirschner/SBN 005592/PAN 31284
Barry@BarryKirschnerLaw.com
*Attorneys for Plaintiff*

## IN THE UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

|  |  |
|---|---|
| Jeffery Wallace,<br><br>                    Plaintiff,<br><br>vs.<br><br>Hartford Life and Accident Insurance Company,<br><br>                    Defendant. | D.C. No.<br><br>**COMPLAINT** |

Plaintiff Jeffery Wallace ("Wallace") alleges for his Complaint:

1.      This dispute is within the jurisdiction of the United States District Court for the District of Arizona.  29 U.S.C. §1132 (a)(1)(B) and (a)(3). Venue is proper.

2.      Wallace was a long-term employee of Freeport-McMoRan ("Freeport") and is a participant in Freeport-McMoRan Inc.'s "Group Long Term Disability Plan for employees of Freeport-McMoRan, Inc."

3.      Defendant Hartford Life and Accident Insurance Company ("Hartford") is an insurer which makes itself available to insure, and to administer Policies of insurance and claims for Plans, including within Arizona and plans governed by the Employee Retirement Income Security Act (ERISA), 29 U.S.C. §1101 et seq.

4.      The relevant insurance group disability protection in which Wallace is a participant is part of a contract between the Plan and Hartford to provide benefits to employees such as Wallace. The Plan is within the scope of ERISA.

5.     The purpose of Congress in enacting the Employee Retirement Income Security Act (ERISA) is described in 29 U.S.C. §1001(b):

> It is hereby declared to be the policy of this chapter to protect interstate commerce and the interests of participants in employee benefit plans and their beneficiaries, by requiring the disclosure and reporting to participants and beneficiaries of financial and other information with respect thereto, by establishing standards of conduct, responsibility, and obligation for fiduciaries of employee benefit plans, and by providing for appropriate remedies, sanctions, and ready access to the Federal courts.

29 U.S.C. §1001(b).

6.     All procedures which must be exhausted prior to bringing this civil action have been exhausted.  This claim is ripe for decision by the United States District Court.

7.     Defendant Hartford owes a fiduciary duty to its Plan participants including Wallace. Hartford has a structural conflict of interest since it is the paying source of benefits and its decision to terminate the claim adds to its wealth. Defendant has acted with bias in terminating Wallace's benefits and not providing a full and fair review of Wallace's claim for long term disability (LTD) benefits, and related appeals.

**EARLY HISTORY OF DISABILITY**

8.     Wallace had medical problems which became disabling by Spring 2016.

9.     Defendant recognized Wallace was disabled and entitled to short term disability (STD) benefits effective March 18, 2016 through June 12, 2016.

10.     Wallace returned to work June 10, 2016.

11.     Medical ailments persisted and Wallace obtained additional medical work-up including from a team of doctors at the Mayo Clinic in Rochester Minnesota, and with Dr. Christopher Marsh in Tucson.

12.     Defendant again acknowledged disability and approved resumed STD benefits effective October 4, 2016.

13.    Defendant approved continued benefits noting:

Med supports ext of claim as ee is unable to perform his occ as a Sr. Engineer which involves Open pit above ground combination of driving, Long range mine planning, driving in pit, working on computer. In a vehicle 20% of the day. Up to 10 hrs per day… [Wallace is referred to by "ee" (employee)].

**THE OCCUPATION OF A MINING ENGINEER**

14.    Wallace was a Senior Mining Engineer and had been since 1993 for Freeport, then known as Phelps Dodge.

15.    Wallace has long worked in an occupation which includes responsibilities to drive in an open pit mine up to ten (10) hours per day.

16.    The occupation performed by Wallace is critical to the operation of a mine and the safety or employees and others who may be at or near the mine site.

17.    As a Senior Mining Engineer, Wallace's substantial and material duties include a combination of driving, short range mine planning, driving in the pit of the mine, and working on a computer. Wallace's employer estimates performance for a Mining Engineer includes being in a vehicle 20% of the day. Sometimes up to ten hours in a vehicle in a single day is required.

18.    The terrain in the pit is unpaved, at times very steep, and more challenging than driving on a public highway. Walking in the pit includes walking near explosives, loose rock, and uneven terrain, sometimes complicated by significant slope. Driving in the pit is difficult, requiring multi-tasking, recognizing changing hazards, complex intersections, steep drops or climbs, and coordinating movement with very large moving machinery at different rates of speed.  In short, it is dangerous to walk or drive in the pit while fatigued or influenced by the effect of powerful medications even when they are prescribed for a recognized condition.

19.    After becoming aware of Wallace's symptoms and medical limitations in November 2016, his employer advised Hartford that the limitations placed by Wallace's

medical providers could not be accommodated for Wallace to perform his occupational duties.

20.    The Physical Requirements of the Mining Engineer is described by Wallace's employer:

> a.    Work is in a mine or manufacturing plant setting, which may include exposure to extremes in temperature and humidity, moving mechanical parts, risk of electrical shock, toxic chemicals, explosives, fumes or airborne particles.
> b.    While performing the duties of this job, the employee is regularly required to stand, sit, demonstrate manual dexterity, climb stairs and ladders, work on elevated platforms, talk, hear and see.
> c.    Occasionally may be required to lift moderately heavy objects (up to 30 pounds) during the course of the workday.
> d.    Personal protective equipment is required when performing work in a mine, outdoor, manufacturing or plant environment, including hard hat, hearing protection, safety glasses, safety footwear, and as needed, respirator, rubber steel-toe boots, protective clothing, gloves and any other protective equipment as required.
> Exhibit 1.

21.    Freeport-McMoRan requires a work environment in which operation of heavy equipment or driving in mine locations is not consistent with certain medications even if those medications are prescribed for medical ailments.

22.    The work of Mining Engineer includes obligations such as deciding where to place explosives, whether on site roads, slopes, bridges or tunnels are safe and adequate, and other critical issues of safety for the entire community within the mine. People have perished because of inadequate performance of these tasks by mining engineers.

///

///

///

///

///

4

**WALLACE HAS BEEN FOUND TO BE DISABLED BY THE SOCIAL SECURITY ADMINISTRATION AND IS ENTITLED TO SOCIAL SECURITY DISIABILITY INSURANCE (SSDI) BENEFITS**

23.     On January 4, 2021, Social Security issued its "Notice of Decision - Fully Favorable," signed by Administrative Law Judge (ALJ) Tin Tin Chen of the Office of Hearing Operations (Social Security Decision). Exhibit 2.

24.     The Social Security Decision, following hearing and review of evidence issued Findings of Fact and Conclusions of Law including:

> 5. The claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except with the following limitations: occasionally climb ramps and stairs, stoop, kneel, crouch, and crawl; should never be expected to work on ladders, ropes, or scaffolds; should never work at unprotected heights or around dangerous, moving machinery; and should never work in extreme temperature conditions.

25.     The ALJ's findings include that the claimant's impairments are corroborated by his friends and family and are overall well supported by the objective medical evidence.

26.     The ALJ recognized the opinion of examining physician Jerome Rothbaum:

> As for the opinion evidence, consultative examiner Jerome Rothbaum, M.D. performed a neurological examination of the claimant and opined that the claimant would be limited to light work with occasional pastoral activities but no climbing of ladders or ropes and should avoid hazards and temperature extremes (Exhibit 26F).
> The undersigned is persuaded by Dr. Rothbaum's opinion. The opinion is supported by Rothbaum's own clinical findings and observations of the claimant during the evaluation. In addition, the opinion is consistent with the record as a whole. As discussed above, this includes evidence of the claimant's lengthy course of treatment for his fibromyalgia and chronic fatigue: clinical findings of the claimant's diffuse tenderness; observations of the claimant's fatigued appearance; the persistence of the claimant's symptoms despite treatment; and the assessment by the claimant's own medical provider that the claimant's symptoms had progressed and worsened since the claimant's amended alleged onset date. For these reasons, the undersigned in persuaded by the opinion of Dr. Rothbaum.

27.     Judge Chen specifically made finding 6:

The claimant is unable to perform any past relevant work (20 CFR 404.1565).

The claimant has past relevant work as a mining engineer. The demands of the claimant's past relevant work exceed the residual functional capacity.

**WALLACE AND FIBROMYALGIA**

28.     Wallace was diagnosed with fibromyalgia in 2005.  He was able to continue work on a continual basis until 2016.

29.     Wallace's fibromyalgia is associated with the onset of pain in multiple locations and fatigue.

30.     Wallace was examined by a team at the Mayo Clinic in Rochester, Minnesota in the summer of 2016.  Findings and assessments of the medical team include that Wallace meets the criteria for diagnosing fibromyalgia using either the 1990 ACR Fibromyalgia criteria or the 2010 ACR fibromyalgia criteria.

31.     The Mayo Clinic team medical work up included a medical note with the Heading *PHYSICAL EXAMINATION* from 7/25/2016 of Dr. Sanjeev Nanda, which states:

Refer to HPI for mood assessment.
Tender Points: 15/18 standard tender points are positive: right occiput, left occiput, right low cervical, left low cervical, right trapezius, left trapezius, right gluteal, left gluteal, right greater trochanter, left greater trochanter, right second rib, left second rib, right lateral epicondyle, left lateral epicondyle, right medial fat pad proximal to joint line of knee, dorsum on right forearm (control point), left thumb nail (control point).
In addition, the patient is diffusely tender over most of the muscle groups and a number of joint regions.

32.     On October 5, 2021, Wallace's treating PCP Christopher Marsh signed a form provided by Defendant clearly stating his opinion that Wallace was impaired from occupational functioning based on physical examinations, objective findings of his, and doctors to whom he had referred Wallace, and the chronic pain which he had been treating Wallace for since his fibromyalgia became disabling.

33.    On September 13, 2022, Marsh again testified to his analysis and support for Wallace's claim. In addition to the chronic pain and fibromyalgia Marsh referred to a multitude of related disabling co-morbidities, and the side effects including cognitive impairments from necessary prescribed medications. Marsh also pointed out the misrepresentations of his position by reviewing non-treating physicians retained by Defendant.  Marsh's September 13, 2022 letter is <u>Exhibit 3</u>

34.    Longtime treating physician Kam Tecaya also has continually supported Wallace in her assessment that he is unable to return to work as a Mining Engineer. Tecaya's letters of support include her examination and conclusions, for instance, as of April 2, 2018 writing her witnessing cognitive impairment and dealing with temperature dysregulation. Tecaya assessed:

> The requirements of his job at the mines are impossible at this time, nor in the foreseeable future. He would be putting himself and others in potential danger. His physical pain and fatigue are severe and his mental activity is compromised.

35.    Tecaya's testimony in letters and medical notes from March 23, 2017; March 31, 2017; November 30, 2018; November 20, 2019; and May 7, 2021 continue to support Wallace's claims.

**WALLACE TAKES POWERFUL PRESCRIBED MEDICATIONS**

36.    The nature of mining is dangerous to the point where it is reasonable for mining operations, including Freeport-McMoRan, to prohibit employees from taking certain medications even if prescribed by doctors for legitimate ailments. This is specified in the Freeport-McMoran "Interoffice Memorandum" of February 4, 2015. That memo cites its Controlled Drug Policy instituted in 2014 which states in part:

> Persons are not permitted to take U.S. Department of Justice Drug Enforcement Agency controlled substances while actively working in safety-sensitive positions. Exceptions to this policy for non-sedating controlled substances or other extenuating circumstances will be reviewed on an individual basis.
> <u>Exhibit 4</u>.

37.    Wallace was not cleared to work by Dr. Kumar on March 22, 2016, evidenced by a check in the box next to the statement: "Employee currently taking prohibited controlled substance per Freeport-McMoran Controlled Drug Use Policy." See Exhibit 5.

38.    As of November 2016, Wallace was prescribed medications which cautioned against using heavy machinery of difficult driving.  For instance, warnings for the prescribed medication taken by Wallace.  Lyrica includes:

> 17.5  **Dizziness and Somnolence**
> Counsel patients that LYRICA may cause dizziness, somnolence, blurred vision and other CNS signs and symptoms. Accordingly, *advise patients not to drive, operate complex machinery, or engage in other hazardous activities* until they have gained sufficient experience on LYRICA to gauge whether or not it affects their mental, visual, and/or motor performance adversely.  [Emphasis added].
> Food and Drug Administration, Accessdata, "Lyrica" https://www.accessdata.fda.gov/drugsatfda_docs/label/2018/021446s035,022488s013lbl.pdf

39.    Other medications taken as prescribed by Wallace, including Duloxetine, also contain warnings that side effects could cause dizziness.

40.    Nucynta (tapentadol) is one of the medications which makes it dangerous or Wallace to return to the occupation mining engineer. Specific statements related to cognitive performance are explicitly stated in its FDA (Food and Drug Administration) labels: "As Nucynta has the potential to impair judgment, thinking, or motor skills, patients should be cautioned about operating hazardous machinery, including automobiles."

41.    The FDA warns for Cyclobenzaprine : "Flexeril, especially when used with alcohol or other CNS depressants, may impair mental and/or physical abilities required for performance of hazardous tasks such as operating machinery or driving a motor vehicle."

42.   The FDA warns for Buspirone HCl:

> Studies indicate that BuSpar is less sedating than other anxiolytics and that it does not produce significant functional impairment. However its CNS effects in any individual patient may not be predictable Therefore patients should be cautioned about operating an automobile or using complex machinery until they are reasonably certain that buspirone treatment does not effect them adversely.

43.   Wallace's medical ailments did not improve from disabling to non-disabling as of the time his benefits were terminated effective January 5, 2022.

44.   Freeport-McMoRan terminated Wallace's lengthy employment by certified letter of April 12, 2017, because the mining company was not able to accommodate the restrictions listed.

45.   Professor Patrick Ronaldson of the Department of Pharmacology of the University of Arizona College of Medicine reviewed the medications taken by Wallace and in a March 17, 2022 report concluded that those drugs were likely to cause cognitive impairment in Wallace. Exhibit 6, Ronaldson report.

46.   Ronaldson's report detailed the pharmacology of drugs taken, as prescribed, by Wallace which have side effects of diminished cognitive abilities, He explained the expected chemical effect of Tapentadol (Nucynta), Cyclobenzaprine (Flexeril) Pregabalin (Lyrica), and Buspirone HCl (BuSpar). After describing the properties of each medication, Ronaldson states:

> Clearly, each of these drugs can cause cognitive impairment individually. When administered in combination, these therapeutic agents can produce synergistic effects on cognitive function. In pharmacology, a "synergistic effect" is defined as the interaction of two or more drugs that produces a pharmacological effect that is greater than the sum of the effects seen when each drug is given alone. This is a fundamental concept in neuropharmacology and is often seen when multiple CNS depressant drugs (i.e., tapentadol, cyclobenzaprine, pregabalin, buspirone HCl) are administered to the same patient.

47.   Ronaldson explains how patients who take these medications can suffer from a "brain fog":

After careful review of the document provided to me, I conclude within a reasonable degree of pharmacological probability that Mr. Wallace's medications (specifically, tapentadol, cyclobenzaprine, pregabalin, and buspirone HCl) have pharmacological effects that can readily diminish cognitive performance. Indeed, patients who are prescribed these medications and take them over a period of several weeks to months can suffer from a "brain fog", a colloquial term that describes impaired cognitive performance including, but not limited to, reduced sharpness of thought, an inability to process and retain information, and delays in responding to stimuli in the external environment.

48.    References to "brain fog" and similar terminology are part of descriptions in many Wallace medical records since 2017.

## DEFENDANT WRONGFULLY TERMINATED WALLACE'S BENEFITS IN 2017, 2019, AND DOES IT AGAIN IN 2022.

49.    In 2016 and 2017, Wallace attempted to navigate his disability claim without the benefit of counsel. Hartford terminated Wallace's short term disability benefits effective November 10, 2016. Hartford denied more than one subsequent *pro se* appeal filed by Wallace.

50.    Wallace retained counsel and a civil action was filed January 16, 2018 explaining why Defendant's position was an abuse of discretion and unfair to Wallace.

51.    The time for Defendant's Answer to Wallace's Complaint was postponed while Wallace's claim for LTD benefits was considered. The LTD benefits claim was granted. Only after the LTD claim was granted did Defendant concede the STD claim and pay Wallace's benefits.

52.    Defendant continued to pay Wallace's LTD claim and paid benefits until another termination, this time effective June 13, 2019.

53.    Wallace, through counsel, filed a December 6, 2019 appeal that Hartford's termination should be overturned.  Exhibit 7.

54.    Hartford engaged three medical reviewers and sent Wallace to an Independent Medical Examination performed by neuropsychologist John Tsanadis. After

forcing Wallace to undergo the expense of an appeal, Hartford concluded that his medical restrictions and limitations made it impossible to safely perform the occupation of mining engineer. Wallace's benefits were reinstated.

**WALLACE MEDICAL HISTORY CONTINUES TO WORSEN**

55.    Hartford possessed much data indicating Wallace's condition was likely to worsen, and it did. Its reviewing doctors acknowledge Wallace's fibromyalgia and its worsening condition. For instance, Dr. Prerna Khanna stated:

> Because Mr. Wallace has American College of Rheumatology criteria defined fibromyalgia which is somewhat impairing, he is not expected to improve from a musculoskeletal standpoint back to a normal baseline. The clinical course of fibromyalgia is generally that those who are diagnosed with this medical condition tend to remain stable with their symptomatology or worsen. It appears that Mr. Wallace has had a diagnosis of fibromyalgia at least since 2014 and his symptoms seem to have worsened, evolving into a chronic fatigue picture supported by laboratory values regarding the Epstein-Barr virus.

56.    The Social Security ALJ noted the opinion of treating Dr. Marsh that the overall condition of Wallace had worsened as described in Marsh's September 2020 notes. Multiple statements from lay witnesses in a position to know establish that Wallace's ability to function has worsened in the past several years. These include mining engineer Greg Baugh, Ray Wallace, and Karen Wallace.  These statements were looked upon as meaningful, credible, and relevant by the Social Security ALJ.

57.    Social Security's ALJ offered these specifics in support of Findings of Fact and Conclusion of Law 5:

> The claimant's allegations, as corroborated by his friends and family, are overall well supported by the objective medical evidence. The record reflects a long history of treatment for fibromyalgia and chronic fatigue prior to the claimant's amended alleged onset date with continued complaints of bodily pain and fatigue since then that affected his sleep and limited him to only light daily activities...In addition, because of the severity of his pain and exhaustion, the claimant was unable to perform physical activities that could help with his deconditioning…Examinations of the claimant documented

tenderness over multiple upper and lower extremity joint and non-joint areas; highly increased pain sensation; muscle tenderness on palpitation, including over the cervical, thoracic, and lumbar muscles; decreased range of motion of the cervical and lumbar spine; and an antalgic gait…In addition, the claimant was observed as low energy and chronically ill…The claimant's persisted [sic] despite treatment that included pain medications, sleep aids, chiropractic treatment, physical therapy, and trigger point injections…In fact, in September 2020, the claimant's own medical provider noted that the claimant's overall condition, particularly including his chronic pain and fatigue, had progressed and worsened since his the claimant's [sic] amended alleged onset date.

58.    A more recent statement by RN Kimberly Wallace describes her father's deteriorating health and a 2021 incident evidencing Wallace's condition.

I have watched my father's health deteriorate for the last 5-10 years with great sadness. He has gone from vibrant and athletically capable, including doing two 12 mile 22 extreme obstacles races with me, to being barely able to participate in routine daily activities including those with few physical demands.

One illustration of the change which I personally witnessed occurred on October 23, 2021. My family went to a pumpkin patch. The field area had mounds and valleys of dirt with rough trails created by the crowds. While the rest of the family including 1- and 3-year-old nephew and niece were able to traverse this patch safely, my father, Jeffery Wallace, was not. He fell and suffered pain from the awkward and distressing fall.  Exhibit 8.

**DEFENDANT'S USE OF PAID REVIEWERS TO UNDERCUT WALLACE'S CLAIM, AND THE ADVICE OF TREATING PHYSICIANS, HAS BEEN BIASED**

59.    Defendant's decision to terminate benefits and deny Wallace's appeal relied on the work product of four doctors. Three of them never met Wallace. The fourth, Brian McCrary, performed an independent medical examination which lasted thirty minutes including a physical exam portion no more than ten minutes.

60.    Each of the four doctors listed documents they received for review. None of the doctors were aware of the Social Security decision or its reasoning favorable to Wallace. None had been provided that decision. None had been provided the principle

12

medical work-up of examining physician Dr. Jerome Rothbaum which was relied on by the Social Security ALJ.

61.    None of the four doctors mentioned or listed anything which suggested they had been informed of Wallace's occupational responsibilities of a Mining Engineer included before they expressed their written opinions of November, 2021, and September 2022.

62.    After the three doctors who never met Wallace issued their opinions, they were provided to Dr. Christopher Marsh who has been treating Wallace for over 20 years. Marsh wrote a September 13, 2022 letter which corrected misinformation including a Hartford statement that he no longer treated Wallace.

63.    Marsh's letter stated that the Hartford-retained doctors were wrong and had attributed conclusions to Dr. Marsh which were contradicted, in Marsh's own handwriting, on the relevant document. That paragraph states:

> The statements made on pages 11 and 16 which attribute to me a conclusion that Jeffrey's disabling symptoms are only based on self-report are wrong. They are directly contradicted by my handwritten note at the bottom of the October 5th, 2021 letter, and my handwritten answers to the questions on the insurance company form. My conclusions regarding his inability to work were based on the many visits and physical examinations of Jeffrey over the past many years. I am the physician that referred Jeffrey to the many physician specialists (including Psychologist for psychometric testing) listed in the reports by doctors Vincent, Kretzmann, and Jasso. These specialists were objective, and each came to their own independent conclusions.

64.    Marsh also made it clear that these insurance company retained doctors did not appreciate the medication side effects of the powerful medications prescribed by Marsh and Wallace's treating physicians:

> The list of medications on pages 15, and 24 were chosen to help him, with serious medical problems where the benefit of taking the medications will outweigh the risks of taking them. Prescribing these medications together is not taken lightly. All of these medications,

especially when taken together in combination, will have certain side effects, and many of these side effects are cognitive impairment.

65.    Marsh linked to the potential dangers and side effects of one of the drugs, Lyrica, alerting the reviewers of the cognitive harm which may be caused by even a single one of these powerful medications.

66.    Marsh's letter addressed that following their advice that would put Wallace back full time in the mine with his fibromyalgia and related conditions would be irresponsible medical practice:

> Fibromyalgia syndrome is a serious condition, and this pain syndrome has seriously affected Jeffrey's health on its own, but he is also afflicted with a multitude of related disabling comorbidities. On page 24 these reviewers state that Fibromyalgia is a condition which should be treated by activity, and therefore Jeffrey should not be following my advice. I disagree. I have always encouraged Jeffrey to remain as active as possible within comfortable limitations such as daily walking and stretching exercises as examples. Taking this concept, and concluding that he can work full time in his profession as a mining engineer, would not be reasonable medical advice.

67.    The Hartford doctors were retained and organized by a well-known vendor doing a large practice for disability insurance companies including Defendant to find persons with medical credentials to write opinions on patients they never meet. The Medical Consulting Referral Form on a document with Hartford's logo does not provide any information regarding the physical requirements of the occupation, or the hazard that inadequate performance might cause to others at a work site.

68.    After being given Marsh's September 13, 2022 letter, a comment was made for the first time reflecting knowledge of Wallace's Mining Engineer occupation: "The provider felt like the claimant was unable to work full time in his profession as a mining engineer."

69.    The Hartford reviewing doctors were never made aware of the type requirements reflected by the Freeport-McMoRan Interoffice Memorandum of February

4, 2015 disallowing work at the mine site for employees who take prescribed medications including those taken by Wallace. Exhibits 3-5.

70.    The medical reviewers were not made aware of the report of Dr. Gretchen Van Maren who witnessed the independent medical examination performed by McCrary and explained in detail why she believed that the examination was not up to a reasonable standard of medicine or being free from bias. Exhibit 9, report of Dr. Van Maren

71.    None of the Hartford-retained doctors were informed that Hartford had paid private investigators to try to obtain disqualifying evidence against Wallace in both 2018 and 2021. After substantial investment both times, the Hartford surveillance established nothing which was inconsistent with Wallace's description of his medical condition.

**THE FINDINGS OF BIASED REVIEWERS WHO WERE NOT PROVIDED VITAL INFORMATION STILL INCLUDED DOCUMENTATION WHICH SHOULD HAVE SUPPORTED A FINDING OF DISABILITY FROM BEING ABLE TO PERFORM THE MINING ENGINEER OCCUPATION**

72.    The conclusion of the medical reviewing Hartford group written after being provided Marsh September 13 letter, gave this explanation for the group:

> The additional medical information does not alter my previous opinion. On 9/13/22, Dr. Marsh noted that the claimant was unable to work, and conclusion regarding his inability to work were based on the many visits and physical examinations over the past many years. The claimant is prescribed many medications to deal with his chronic pain, and other medical problems. All of these medications, especially when taken together in combination, will have certain side-effects, and many of these side effects are cognitive impairment. The claimant is afflicted with a multitude of related disabling comorbidities. I am unable to concur with a recommendation of no work status, as there is no documentation of clinical findings to suggest **total** inability of activity, such as functional loss of strength/sensation and mobility/gait; therefore, the claimant is able to sustain occupational functioning as previously outlined. On a more technical basis, the amount of time does the claimant can sit [sic], stand and walk are well **above 3 hours per day**, which would work against the recommendation of **total work restriction**. Additionally, the medical records do not support any medication side effects that result in

specific impairment from 1/5/2022 forward. Therefore, my previous opinion remains unchanged. [Emphasis added].

73.     The September 2, 2022 assessment of the Hartford's group report states in part:

> Rheumatology co-reviewer Dr. Kretzmann asserts that the claimant's pain symptoms are clinically consistent with fibromyalgia, a condition that should be treated with activity and actually at risk of worsening with activity restrictions. The claimant's CVID has been treated but does not result in functional restriction; Dr. Kretzmann does not recommend restrictions. (page 24 of 24).

But Kretzmann stated:

> **Total** work restriction is too severe since **total** work restrictions are usually reserved for those who have severe impairment secondary to more serious conditions… As such above recommended **total** work restrictions is too restrictive and is not supported based on the measurable evidence. (Emphasis added).

74.     After receiving a direct statement from Dr. Marsh that Wallace was taking prescribed medication which, the Hartford reviewer Kretzmann stated:

> I acknowledge that there were possible side effects from the prescribed medications or their combination" but then dismisses the knowledge of Marsh's treating physician, (and expert pharmacologist Ronaldson), stating "…however there were no reported side effects or any related complaints about his medication regimen of severity in the provided documents impacting his functional status.

The Hartford reviewers were never provided the Freeport-McMoRan drug memo. Exhibit 3.

75.     Hartford reviewer Vincent, who in his first expressed opinion never mentions longtime treating PCP Dr. Marsh's October 2021 medical opinions, adds an addendum after being provided with Marsh's September 23, 2022 letter. It states in part:

> The claimant is prescribed many medications, especially when taken together in combination, will have certain side effects, and many of these side effects are cognitive impairment. The claimant is afflicted with a multitude of related comorbidities. I am unable to concur with a recommendation of **no work status**, as there is no documentation of clinical findings to suggest **total** inability of activity, such as functional loss of strength/sensation and mobility/gait; therefore, the

claimant is able to sustain occupational functioning as previously outlined. [Emphasis added].

**DEFENDANT SENDS WALLACE FOR A THIRTY-MINUTE SESSION INCLUDING A TEN-MINUTE PHYSICAL EXAMINATION WHICH RESULTS IN TERMINATING BENEFITS AFTER FIVE YEARS**

76.     On November 16, 2021, Defendant arranged for an independent medical examination with Dr. Brian McCrary. McCrary reported back that Wallace had no restrictions and limitations. Defendant then retained a panel of three additional doctors who all relied on McCrary's examination to conclude that Wallace had no relevant restrictions and limitations.

77.     McCrary admits:

There are extensive notes consisting of neuropathic treatments with unconventional treatments and unconventional lab testing. **All records provided are years old and nothing provided was more recent than 2019**. [Emphasis added].

78.     McCrary's report incorrectly states that Wallace was last seen by Dr. Marsh in July 2021 when Marsh had seen him September 27, 2021 and signed a statement October 5, 2021. McCrary indicates familiarity with a 2019 IME neuropsychological report by John Tsanadis, but not with a 2017 report by a treating provider which concluded that Wallace was disabled and unable to return to perform as he had in his occupation.

79.     The Wallace examination by McCrary was witnessed by Board Certified anesthesiologist Dr. Gretchen Van Maren. Van Maren is disabled for medical reasons and no longer able to practice because of her physical difficulties. Van Maren volunteered without pay to witness the examination and prepared for what she would expect from a professional examination regarding Wallace's fitness for occupation as a mining engineer. Van Maren created a report of what she witnessed. That report is Exhibit 9.

80.     Van Maren considered that an insightful examination would include testing for fibromyalgia including trigger points, quantifying the effects of prescription medications, a sensory examination including reflex testing, an assessment of overall

17

muscle strength and physical endurance when challenged with extended exertion, and a rough analysis of his walking gait.

81.    Van Maren witnessed the entirety of the interaction between Wallace and McCrary. It lasted a total of thirty minutes.  The physical examination component was ten of those 30 minutes.

82.    Van Maren witnessed that there was no sensory exam conducted, and only one very non-specific test which related to balance. Many tests which Van Maren expected would be performed were not. "There was absolutely no questioning by Dr. McCrary about medication side effects that Mr. Wallace might be experiencing."

83.    Van Maren had reviewed the workups of treating physicians Christopher Marsh and Kam Tecaya on Wallace and found them to be "…far more informative and authoritative than the brief examination and report of McCrary."

84.    After reading McCrary's report and findings, Van Maren read the analysis of Dr. Patrick Ronaldson, neuropharmacologist and Professor at the University of Arizona. Van Maren states:

> Dr. Ronaldson's analysis of Mr. Wallace's prescribed medications is consistent with my understanding of the effects of these drugs. Reading and understanding what can be expected side effects of these prescriptions is very important. Conversely, it is a very poor practice for a doctor in the IME role to not address these very serious considerations. Dr. McCrary failed to consider medication side effects that Mr. Wallace regularly experiences.

85.    Van Maren concluded:

> The examination and report by Dr. McCrary was not a fair and effective assessment of Mr. Wallace's medical difficulties. Dr. McCrary's report rejects the medical workup of multiple treating physicians who are and were motivated to help Mr. Wallace improve his health. Dr. McCrary's history and physical examination were not performed to professional standards of what I expected, or to the standard that a fair system of review of claims should require.

86.      Van Maren's report and what she witnessed was **not** provided to the medical reviewers who Defendant retained and who fully endorsed McCrary's conclusions. Nor is there any evidence that it provided to McCrary for his potential rebuttal.

87.      Internally in Defendant's claim file, Van Maren was dismissed as "unlicensed" and her observations and report were given no weight. There was no explanation for why her description of an examination of no more than 30 minutes including only 10 minutes of physical examination requires a medical license. In fact, Van Maren retains her medical license, and never stated anything to the contrary.

88.      Additional evidence of McCrary's history of bias was provided to Defendant in Wallace's appeal in the section at page 8-12 with subheading 10.  McCrary Report deserves no Weight., together with relevant exhibits on that point.". (Exhibit 7, sections 10-10d)

89.      In 2019, Defendant retained neuropsychologist John Tsanadis to perform an independent neuropsychological examination of Wallace. Wallace had previously undergone neuropsychological testing and evaluation by Dr. Paul Beljan who concluded in his October 2017 report:

> Jeffrey is experiencing numerous medical complications that have significantly compromised his cognitive and physical abilities. In my opinion he is disabled. There is no way that Jeffrey can perform his chosen occupation to the level he had performed the past 25 years. Exhibit 6, December 6, 2019 appeal at page 8.

Wallace had been referred to Beljan by his treating physician Dr. Christopher Marsh.

90.      Wallace was commanded to appear before Tsanadis and told that the authorization form he was given to sign could not be changed with even a single word, and that his refusal to sign it as given would result in a failure to cooperate with subsequent loss of benefits. The Tsanadis report states: "The claimant was also informed that neither the examiner nor PsyBar required him to participate in the assessment."

91.     Wallace requested that his examination be witnessed. Tsanadis would not allow this. Wallace was not advised how long the testing would take place, when there would be opportunity for breaks, or when he would be able to speak with his wife who would provide his transportation to and from the examination. Wallace asked, through counsel, whether he would be provided a copy of the results of his exam and was told he could get it only after a decision terminating his claim was made.

92.     Tsanadis has testified under oath in another case that what could be learned from a claimant's treating psychologist, spouse, or other lay witness, is not even relevant compared to the findings of his testing procedures. Unlike Dr. Beljan, a treating neuropsychologist, Tsanadis did not interview or ask for data from any family members and had little or no knowledge about fibromyalgia or Wallace's medication load. At one point in his report Tsanadis states Wallace does not have a condition that would be expected to result in psychological impairment and then contradicts his statement with, "It would not be surprising if pain results in transient cognitive symptoms from day to day?" There is no reason to believe that Tsanadis was familiar with the requirements of mining engineer as an occupation.

93.     The Tsanadis report was centered on 6.5 hours of testing in a setting where Wallace was completely inexperienced and subject to the complete control of the Defendant's paid for examiner.

94.     Defendant possessed the Tsanadis report prior to determining that Wallace's 2019 appeal should be granted and reinstating his benefits in January 2020. Defendant also possessed significant data to call Tsanadis' bias into question by having the Wallace 2019 appeal, particularly pages 8-12. The data provided to Hartford included analysis of a universe of 5 Tsanadis examinations, none of which resulted in an opinion acknowledging any restrictions. Later review by a neutral decision maker included rejection of Tsanadis conclusions by the United States District Court, by an Arizona

1 Superior Court jury in Pima County, and by the other insurer (Cigna) which had retained
2 Tsanadis for an IME or disability medical review.

3      95.    Defendant did not share any of the data which was critical of Tsanadis in
4 the 2019 appeal to any of its later paid for reviewers and consultants.

5

6 **MINING ENGINEER IS THE ONLY GAINFUL OCCUPATION FOR WHICH**
**WALLACE IS QUALIFIED ACCORDING TO DEFENDANT'S**
7 **OCCUPATIONAL ASSESSMENTS IN 2019 AND AGAIN IN 2021**

8      96.    Defendant identifies the amount of salary required to meet the contractual
9 definition of "gainful" occupation is $5,048,44 per month.

10      97.    Defendant's occupational analyst Rebecca Ketts was instructed by
11 Defendant that Wallace was not subject to any medical restrictions or limitations. This
12 ignored the findings of the Social Security Administration and its ALJ, and the medical
13 opinions of all treating physicians. It also listed that Wallace was not able to perform the
14 work function of Driving-Operating.

15      98.    The December 29, 2021 employability benefit analysis by Defendant's
16 Vocational Case Manager included an "ABILITY PROFILE" for Wallace which included
17 columns indicating climbing- never; balancing- never. . .crawling-never."

18      99.    Defendant has never given any reasoned explanation of why the SSDI
19 findings of disability were rejected by any occupational analyst. Defendant's termination
20 letter essentially stated no more than SSDI has a different standard and that Defendant is
21 not obligated to follow it.

22      100.    For instance, Defendant's October 27, 2022 letter denying Wallace's appeal
23 makes no attempt to rebut ALJ findings such as Wallace "…should never work at
24 unprotected heights or around dangerous, moving machinery, and should never work in
25 extreme temperature conditions."

26

27

28

101.   There is no evidence of Defendant considering the balance difficulties documented by many including lay witnesses, Greg Baugh, Karen Wallace and Jeffery Wallace, and found to be credible by the SSDI ALJ.

102.   There is no evidence that the incident described by Kimberly Wallace as occurring October 23, 2021, and further described by Jeffery Wallace in his statement was considered or given any weight. The description of witnessing Wallace's fall that day was that he was unable to traverse a pumpkin patch which could easily be done by a 3-year-old child. Jeffery Wallace describes the incident in his August 1, 2022 statement:

> …An incident like the one described by Kimberly from October 2021 illustrates a very sad truth. I have difficulty safely moving in a course with such minor obstacles that my grandchildren can handle it without a problem. This was embarrassing and demoralizing.
> Exhibit 10.

103.   The concept of balance being a difficulty for a Mining Engineer is not mentioned in the reports of McCrary or any of the three medical reviewers hired by Hartford who never met or saw Wallace.

**DEFENDANT ORDERS SURVEILLANCE TWO TIMES TOTALLING SEVEN DAYS AND LEARNS NOTHING WHICH IS INCONSISTENT WITH WALLACE'S DISABILITY CLAIM**

104.   In May 2018, Defendant financed an investigation including surveillance of Wallace for three days. It produced no negative information which could be used against Wallace's claim. The surveillance was hidden from Wallace when he requested his claim file to enable an appeal. The appeal was successful.

105.   In August 2021, Defendant again financed an investigation including surveillance and a stake out of Wallace's home. This included informing local police that they were watching Wallace. Again, the surveillance produced no negative facts for Defendant to use to contradict Wallace's claim. The 2021 surveillance was raised in Wallace's appeal as evidence supporting his claim since it is consistent with the lack of activity described in Wallace's claim.

106.   Defendant denied having conducted 2021 surveillance:

To that point, the scope of this appeal review concerns Mr. Wallace's functionality as of 1/4/2022, so information from many years prior would not be relevant even if we accept your premise that lack of documented activity on random days proves a certain level of functionality, which we do not." [Emphasis added].
Hartford letter of October 27, 2022.

107.   The bill reflecting Defendant's payment for the 46-page comprehensive report is <u>Exhibit 11.</u> Defendant did not include the 2021 surveillance report following Wallace's most recent request for relevant information as authorized by 29 C.F.R. 2560.503-1(m)(8). It was included in response to a January 2022 request for documents. It found no evidence to use against Wallace and the validity of his claim.

108.   Defendant's rejection of the concept that a surveillance of seven days over two time periods which reveals no activity by a disability claimant has no significance, reflects a bias inconsistent with its obligation to handle claims and appeals in a fair manner.

## DEFENDANT HAS USED AN ARBITRARY AND INAPPROPRIATE STANDARD OF REVIEW IN TERMINATING WALLACE'S LTD BENEFITS

109.   Nowhere in the Policy definitions of the relevant Plan is there a requirement that the medical ailment causing disabling symptoms needs to have those symptoms, or the degree of those symptoms, measurable as if a laboratory numerical analysis or a radiology image finding were necessary.

110.   Fibromyalgia has been a long recognized physical medical ailment which is often accompanied with disabling features.  E.g. *Lang v. Long-Term Disability Plan of Sponsor Applied Remote Technology, Inc.*, 125 F.3d 794, 799 (9th Cir. 1997).

111.   The materials on the American College of Rheumatology website do not support the idea that a chronic patient like Wallace can safely operate in an occupation such as mining engineer where the safety of everyone at the mine relies on the engineer's

ability to handle dangerous stressful situation which are unexpected at any time of day and in all climates.

112.    The American College of Rheumatology has a section for Fibromyalgia (Fibromyalgia Section) including The Role of the Rheumatologist:

> Fibromyalgia is not a form of arthritis (joint disease). It does not cause inflammation or damage to joints, muscles, or other tissues. However, because fibromyalgia can cause chronic pain and fatigue similar to arthritis, some people may advise you to see a rheumatologist. As a result, often a rheumatologist detects this disease (and rules out rheumatic diseases). For long term care, you do not need to follow with a rheumatologist. Your primary care physician can provide all the other care and treatment of fibromyalgia that you need.

113.    The Defendant and its reviewers have cherry picked a sentence or two and disregarded the information which was influential in the findings of the ALJ who received evidence and made his finding that Wallace could not perform as a mining engineer.

114.    The Fibromyalgia section includes instructions on self-help and trying to cope with the ailment, with the goal of living a "more normal" life. Tips to add to the possibility of leading a more normal life include "make time to relax each day."

115.    The difficulty of measurement of diseases including fibromyalgia has been the subject of discussion by the United States Court of Appeals where the consensus is that it is not legitimate to require an unprovable quantity or quality of evidence to prove a disease such as fibromyalgia or the measurement of pain or discomfort from the disease. E.g., *Salomaa v. Honda Long Term Disability Plan*, 642 F.3d 666, 676-678 (9th Cir. 2011).

116.    Defendant has acted contrary to its obligations of fairness to participants by requiring what it calls objective proof of the unmeasurable. For instance, instead of agreeing with a treating physician of twenty years, it gives no weight to Dr. Marsh's opinion that the medications he has prescribed have side effects including cognitive impairment. Similarly, Defendant dismisses the analysis of Pharmacology expert Professor Ronaldson's opinion that to a reasonable degree of probability the medications

taken in combination by Wallace have pharmacological effects that readily diminish cognitive performance. Defendant ignores the 2015 memorandum of Freeport-McMoRan disqualifying its personnel from working at mine sites if taking certain prescription medications such as what Wallace has been prescribed.

117. Defendant arbitrarily accepts the statement of a medical reviewer on one of its panels that Fibromyalgia is best treated with encouraging movement as if Dr. Marsh is unaware of his duties as treating physician, or as if the encouragement of exercise as tolerated is the equivalent of a pass to work at a mine site where the safety of co-workers depends on his effectiveness.

118. Hartford and its reviewers ignore the undisputed evidence that Wallace attempts a 20-minute one mile walk each day, and Tai Chi, a type of exercise consistent with the College of Rheumatology recommendations. Wallace's exercise efforts are known by and consistent with treatment recommendations of both Drs. Marsh and Tecaya.

119. Defendant ignores the many pieces of evidence that Wallace is no longer fit to work at a site requiring exquisite balance. It ignores the findings of the Social Security Administration and did not provide the ALJ's medical evidence including the physical examination of Dr. Rothbaum which was critical data for his conclusions to any of its hired doctors. It even ignores its own occupational evaluation form of Wallace's capabilities which included climbing-never; balancing-never; crawling-never.

120. Wallace has support for his claim from multiple treating physicians who had performed many diagnostic techniques including physical examination. Defendant has no medical doctor, or physician of any sort, who denied the existence of fibromyalgia in Wallace.

121. Defendant has improperly discredited the history of medical ailments described by Wallace in multiple medical histories and the advice, opinions, and medical examination assessment of Wallace's treating physicians.

**DEFENDANT'S CLAIMS HANDLING VIOLATES THE COVENANT OF GOOD FAITH AND FAIR DEALING IN INSURANCE CONTRACTS**

122.    The facts which evidence bad faith by Defendant include:

a.    Failure to provide critical information to persons relied on during Hartford's decision-making process. For instance, there is no doctor relied on by Hartford who was aware of the requirements of a Mining Engineer. None of the Hartford doctors were aware of the detailed facts and medical analysis contained in SSDI ALJ Findings; or if they were aware, all avoided addressing the SSDI Findings;

b.    No Hartford-retained medical reviewers or doctors were aware of either of the two surveillance attempts totaling 7 days which resulted in witnessing ONLY the absence of activity for Wallace;

c.    Hartford made the relevant question not whether Wallace could return to the gainful occupation of mining engineer but whether his treating Physicians had established with objective evidence that he was disabled from any work;

d.    The general encouragement to exercise from the College of Rheumatology for those afflicted with fibromyalgia was exaggerated to be given greater weight than a 20-year PCP treating physician which was used to override the treating doctor's advice that he could not perform the occupation of mining engineer;

e.    The effect of powerful medications, the type of which employer Freeport-McMoRan described as disqualifying in it 2014 memo and which its Dr. Kumar stated disqualified Wallace from returning to work as a mining engineer in 2016 was given no weight by the independent medical examining physician;

f. The opinions of neuro-pharmacologist Dr. Ronaldson and treating Dr. Marsh regarding medication effects and cognitive impairment were given no weight by Hartford reviewers or Hartford;

g. The findings of the Social Security Administration ALJ that Wallace was unable to work as a mining engineer, and that he should never be expected to work on ladders, ropes, scaffolds, unprotected heights, dangerous moving machinery, or in extreme were given no weight by Defendant and never rebutted by medical reviewers or any Hartford personnel;

h. Lay testimony which was afforded great credibility by the Social Security Administration ALJ with testimony regarding Wallace's difficulties such as fatigue, and balance were given no weight by Defendant;

i. Evidence of bias of the medical examiners and medical reviewers hired by Defendant were disregarded whether from witnesses with medical training to the examinations performed, or a treating physician, specifically PCP Marsh, who pointed out inaccuracies the Hartford doctors attributed to his work, records, and his specific words in responding to the Hartford in October 2021; and

j. Giving greater weight to a 30-minute "independent" medical exam including ten minutes of physical examination than to all treating physicians' documentation over years of examination, testing, referrals to other professionals, and treatment designed to improve the patient's health.

///

///

///

27

**COUNT 1**

**DECLARATORY JUDGMENT**

123.    Wallace incorporates all paragraphs above as if fully set forth herein.

124.    Defendant has a financial and structural conflict of interest which has influenced LTD decision making adverse to the interests of fairness and of Wallace.

125.    Defendant have breached their fiduciary duties by not performing their duties solely in the interests of the participants and beneficiaries and for the exclusive purpose of providing benefits to participants and their beneficiaries as required by ERISA, 29 U.S.C. § 1104(A)(1).

126.    Defendant improperly terminated the Wallace claim for LTD benefits.

127.    Wallace asks for a Declaratory Order that:

        a.  Long Term Disability benefits should be paid for the entire period of Wallace's past eligibility and should be reinstated going forward; and

        b.  Wallace be awarded pre-judgment interest, attorney's fees, and all relief that the Court deems just.

RESPECTFULLY SUBMITTED this 8th day of February, 2023.

BARRY KIRSCHNER LAW, LLC

By: ____/s/ Barry Kirschner  #005592
        Barry Kirschner
        Barry Kirschner Law, LLC
        2205 E. Speedway Blvd.
        Tucson, AZ 85719
        Phone: 520-849-7771
        Fax: 520-849-7773
        Barry@BarryKirschnerLaw.com
        *Attorney for Plaintiff*