**WO**

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Jeffery Wallace, | No. CV-23-00071-TUC-JGZ |
| Plaintiff, | **ORDER** |
| v. | |
| Hartford Life and Accident Insurance Company, | |
| Defendant. | |

In this action, Plaintiff Jeffery Wallace seeks judgment against Defendant Hartford Life and Accident Insurance Co. (Hartford), declaring him disabled and reinstating long term disability benefits. Now pending before the Court are the parties' Cross-Motions for Summary Judgment. (Docs. 28, 29.) The motions are fully briefed. (Docs. 32, 33.) The parties submitted an additional Stipulated Chronology of Relevant Facts (Doc. 39), and the Plaintiff submitted a list of relevant facts not within the stipulated chronology (Doc. 38). Having reviewed the parties' filings and the record, the Court will deny Plaintiff's Motion (Doc. 29) and grant Defendant's Motion for Summary Judgment (Doc. 28).

## I.    Background[1]

Plaintiff Jeffery Wallace worked as a mining engineer for Freeport-McMoRan Inc. (Freeport) and its corporate predecessors for 23 years. (Doc. 28 at 3.)[2] As a benefit of his

---

[1]  The Background and Facts are taken from the administrative record and the parties' filings. The administrative record was submitted in two parts, (Docs. 25, 26). Neither party filed a separate statement of facts in support of their motion or a controverting statement of facts.

[2]  Record citations refer to the page numbers generated by the Court's CM/ECF filing system.

employment, Wallace enrolled in the Group Insurance Policy (the Plan) offered to the employees of Freeport and purchased by Freeport from Defendant Hartford Life and Accident Insurance Co., the administrator of the Plan. (*See* Doc. 26-11.) The Plan is governed by the Employee Retirement Income Security Act (ERISA), 29 U.S.C. § 1001, *et seq*. (*See id*.)

On February 4, 2015, Freeport issued an interoffice memorandum effectively banning employees from taking controlled substances, including prescription medication with sedating effects, while actively working in safety-sensitive positions such as mining engineer. (Doc. 25-7 at 55–56.) On March 22, 2016, Wallace undertook an occupational medical exam by Freeport and was not cleared to return to work due to the medications he was taking at the time. (Doc. 25-8 at 31–32.) Wallace continued to have health issues and, in July 2016, was ultimately diagnosed with fibromyalgia. (Doc. 25-9 at 7–14.) Wallace left work permanently on September 27, 2016. (Doc. 26-4 at 115.) After initially denying benefits, Hartford determined that Wallace was entitled to short term disability (STD) benefits through November 20, 2016. (*Id.* at 114–17.) Hartford approved Wallace's long term disability (LTD) benefits beginning March 28, 2017. (Doc. 25-4 at 121.) Wallace's employment was terminated on April 12, 2017, due to Freeport's inability to accommodate his medical restrictions. (Doc. 26-4 at 129.)

On March 3, 2021, Hartford sent Wallace an annual review letter along with forms to complete and return with medical records showing proof of loss to confirm his continued disability eligibility. (Doc. 25-5 at 100–01.) Upon review of the medical evidence, Hartford terminated Wallace's claim on January 4, 2022. (*Id.* at 14–20.) Wallace appealed Hartford's termination of his claim on August 8, 2022. (Doc 25-7 at 25–38.) Hartford retained an independent panel of doctors to perform a tri-morbid review. The panel found insufficient support for any restrictions and limitations (R&Ls). (*Id.* at 16.) Wallace appended his appeal with an additional report from his primary care physician (PCP), Dr. Marsh, responding to the panel report, (Doc. 25-6 at 72–73), and Hartford's independent reviewers issued addenda confirming their findings, (*Id.* at 30–42). On October 27, 2022,

Hartford issued its final determination letter to Wallace. (Doc. 25-4 at 121.) The letter detailed the evidence reviewed and concluded, "based on the weight of the medical, vocational and overall claim evidence; we find that [Wallace] does not meet the Any Occupation definition of Disability as of 1/5/2022 forward and the termination of Mr. Wallace's claim is upheld on appeal." (*Id.* at 121–33; Doc. 25-5 at 1–4.) This action followed.

## II.    Summary Judgment Standard

A court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). The movant bears the initial responsibility of presenting the basis for its motion and identifying those portions of the record, together with affidavits, if any, that it believes demonstrate the absence of a genuine issue of material fact. *Id*. at 323. A genuine dispute exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party," and material facts are those "that might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

A movant is entitled to judgment as a matter of law against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. *Celotex*, 477 U.S. at 322. In *Celotex*, the Supreme Court explained: "In such a situation, there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial. The moving party is 'entitled to a judgment as a matter of law' because the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof." *Id*. at 322–23.

At summary judgment, the judge's function is not to weigh the evidence and determine the truth but to determine whether there is a genuine issue for trial. *Id*. In its analysis, the court must believe the nonmovant's evidence and draw all inferences in the

nonmovant's favor. *Id*. at 255. In reviewing the evidence, the court need only consider the cited materials, but it may consider any other materials in the record. Fed. R. Civ. P. 56(c)(3).

## III.    Relevant Facts

### A.    The Plan

The Plan issued to Freeport was effective January 1, 2005. (Doc. 26-11 at 5.) Under its terms, any full-time employee is eligible to receive disability insurance for income protection if they become disabled from a covered accidental bodily injury or sickness. (*Id*.) LTD Benefits become payable to a participant of the Plan if: (1) the participant becomes disabled while insured under the Plan; (2) the participant is disabled throughout the Elimination Period; (3) the participant remains disabled beyond the Elimination Period; (4) the participant is, and has been during the Elimination Period, under the Regular Care of a Physician; and (5) the participant submits Proof of Loss satisfactory to Hartford. (*Id*. at 8.) The Elimination Period means "the period of time [a participant] must be Disabled before benefits become payable," which is 180 days per the Plan. (*Id*. at 5.)

To be considered "Disabled," a participant must prove: (1) during the Elimination Period, the participant is prevented from performing one or more of the Essential Duties of "Your Occupation"; (2) for the 24 months following the Elimination Period, the participant is prevented from performing one or more of the Essential Duties of Your Occupation and, as a result, the participant's Current Monthly Earnings are less than 80% of their Indexed Pre-disability Earnings; and (3) after the 24 months following the Elimination Period, the participant is prevented from performing one or more of the Essential Duties of Any Occupation. (*Id*. at 21.)

Under the Plan, "Your Occupation" means "your occupation as it is recognized in the general workplace. Your Occupation does not mean the specific job you are performing for a specific employer or at a specific location." (*Id*. at 22.) "Any Occupation" means "an occupation for which you are qualified by education, training or experience, and that has an earnings potential greater than an amount equal to the lesser of the product of your

1   Indexed Pre-disability Earnings and the Benefit Percentage for which you enrolled and the
2   Maximum Monthly Benefit shown in the Schedule of Insurance." (*Id*. at 20.) The "Any
3   Occupation" standard applied to Wallace as of March 28, 2019. (Doc. 28 at 4.)

4       The Plan gives Hartford "full discretion and authority to determine eligibility for
5   benefits and construe and interpret all terms and provisions of the Group Insurance Policy."
6   (Doc. 26-11 at 20.) Benefits will terminate on the date a participant is no longer Disabled.
7   (*Id*. at 9.) The Policy states: "[Hartford] may request Proof of Loss throughout Your
8   Disability." (*Id*. at 17.)

9       **B.    Defendant's First Termination of Benefits**

10      In October 2018, Hartford began collecting records for an investigation to determine
11  whether Wallace would qualify as disabled under the stricter "Any Occupation" standard.
12  (Doc. 25-4 at 63–64.) Hartford paid benefits during the investigation. (Doc. 25-5 at 137.)
13  Dr. Tecaya, Wallace's naturopath, and Dr. Marsh, Wallace's family care practitioner, each
14  submitted an "attending physician statement" (APS) as well as narrative letters in support
15  of the disability determination. (Doc. 28 at 5.) Dr. Tecaya found Wallace could sit for an
16  hour at a time, up to four hours per day, stand for an hour, and walk for an hour. (Doc. 26-
17  3 at 62–64.) Dr. Marsh found Wallace could sit for an hour at a time up to four hours per
18  day, stand for two hours, and walk for one hour. (*Id*. at 16.) As such, according to Wallace's
19  treating doctors, Wallace could work up to six hours per day. Dr. Selz, Wallace's
20  psychologist, did not submit an APS, but provided office notes. (Doc. 26-2 at 119–29.)[3]

21      A Hartford behavioral health case manager determined that there was no support for
22  psychiatric R&Ls. (Doc. 25-4 at 12.) But because Wallace's neuropsychological testing
23  was outdated, Hartford provided its behavioral health report to Dr. Domingo, an internal
24  neuropsychological medical director, to determine if cognitive improvement would be
25  expected. (*Id*.) Dr. Domingo opined that Wallace's cognitive functioning would improve
26  with treatment and recommended Hartford reach out to Dr. Selz about repeat testing. (*Id*.

27  ─────────────
28  [3]  In December 2018, Wallace was denied Social Security Disability Insurance (SSDI)
    when the Social Security Administration (SSA) found Wallace "still able to stand, walk
    and sit for periods of time." (Doc. 26-3 at 53–56.)

at 5–6.) Hartford attempted to contact Dr. Selz but was unsuccessful. (Doc. 25-3 at 132; Doc 25-4 at 5.) Thereafter, Hartford asked a third-party vendor to coordinate a review of the file by an independent board-certified physician to assess Wallace's cognitive and physical R&Ls. (Doc 25-4 at 40–41.) Dr. Khanna, an occupational medical physician, provided a report on March 14, 2019, in which he opined that Wallace could stand or walk for one hour at a time up to eight hours a day, lift 20 pounds, and push or pull 30 pounds. (Doc. 25-13 at 113–25.) Dr. Khanna explained that the lifting restrictions were not based on an in-person exam, but were consistent with a fibromyalgia diagnosis, and that Wallace's reported immune deficiency was a lab diagnosis that had not yet manifested. (*Id*. at 121–22.) Dr. Khanna declined to address Wallace's cognitive impairment because mental health was "out of [his] scope of practice." (*Id*. at 122–23.) Dr. Khanna attempted to reach Drs. Tecaya and Marsh for comment but was unable to speak to either. (*Id*. at 120.) A copy of Dr. Khanna's report was sent to Drs. Tecaya and Marsh for review, comment, and to ask about further neuropsychological testing. (Doc. 25-5 at 138–41.)

Hartford conducted an Employability Analysis using the Occupational Access System (OASYS) with information provided, in part, in Dr. Khanna's report, to determine whether there were occupations for which Wallace was qualified that met the earning requirements under the Plan and were consistent with the reported physical R&Ls. (Doc. 25-15 at 102–14.) The March 26, 2019 Employability Analysis Report (EAR) concluded that Wallace could physically perform the occupation of mining engineer. (*Id*. at 104.)

Because Wallace's physicians did not respond to the various requests for comment, Hartford's clinical team recommended a neuropsychological independent medical examination (IME). (Doc. 25-3 at 114.) Hartford hired another third-party vendor, who selected an independent physician, Dr. John Tsandis, to conduct the IME. (Doc. 25-15 at 30–44.) Dr. Tsandis reviewed all medical records and conducted in-person neuropsychological testing on May 8, 2019. (*Id*.) In his May 22, 2019 report, Dr. Tsandis concluded determinations based on Wallace's 2017 neuropsychological testing were not well supported and that Wallace likely used insufficient effort during that testing. (*Id*. at

43.) Dr. Tsandis found that Wallace's self-reports of fatigue were likely unreliable as Wallace performed better on more difficult tasks later in the afternoon. (*Id*. at 42–43.) Dr. Tsandis concluded that there was no support for a neurocognitive disorder and that no neuropsychological R&Ls were supported. (*Id*.)

Hartford provided Dr. Tsandis's IME report to Drs. Tecaya, Marsh, and Selz. (Doc. 25-5 at 127–32.) Dr. Tecaya disagreed with Dr. Tsandis's conclusions. (Doc. 25-15 at 26.) Dr. Marsh responded with previous disagreements to Dr. Khanna's report, but did not comment on Dr. Tsandis's IME report. (*Id.* at 17.) Dr. Selz disagreed with Dr. Tsandis's IME report, but admitted she had not conducted formal testing, stating that she simply observed the cognitive deficits. (*Id.* at 7.) Hartford completed its review of Wallace's benefit claim, determining that he did not meet the policy definition of Disability beyond June 13, 2019, and terminated his LTD benefits. (Doc. 25-5 at 119–26.)

Wallace appealed the determination through counsel, submitting additional materials including information about his specific job, a report from a privately hired vocational expert, a list of Wallace's current medications, and declarations from family and friends. (Doc. 25-13 at 31–126; Doc. 25-14 at 2–36.) Hartford obtained a tri-morbid review through an additional vendor consisting of Dr. Panzer, a psychologist, Dr. Lecovin, a naturopath, and Dr. Schiopu, a rheumatologist. (Doc. 25-12 at 154–70; Doc. 25-13 at 2–23.) The reviewers issued a report on January 15, 2020, which outlined the following R&Ls: sitting up to one hour at a time with five minute breaks for up to eight hours; standing for up to one hour at a time for two hours a day; walking up to 30 minutes at a time for up to four hours per day; rarely lift/carry 20 pounds; and change position every 30 minutes without interrupting workflow. (Doc. 25-13 at 14.) Based on the R&Ls, Hartford obtained an EAR on January 17, 2020 that showed the occupation of mining engineer had lifting requirements inconsistent with the R&Ls. (Doc. 25-12 at 147–48.) Hartford then reinstated benefits on January 21, 2020. (Doc. 25-5 at 110.)

//

//

- 7 -

### C.    Social Security Determination

Wallace was adjudicated as disabled by the SSA through a determination of an administrative law judge (ALJ), awarding Wallace with SSDI. (Doc. 25-10 at 7–16.) Wallace provided Hartford with proof of the award in January 2021. (Doc. 25-12 at 53.) Wallace did not provide Hartford the underlying medical evidence submitted to the ALJ but provided the ALJ's findings and recommendation in support of the award and the SSA determination letter. (*See id.*) The ALJ found Wallace had residual capacity for light-duty work, with exceptions, and that Wallace was not impaired by a neurocognitive disorder. (Doc. 25-10 at 11–12.) In the determination, Wallace received an age-related presumption against transferrable skills, and no suitable alternative occupation was identified. (*Id.* at 13.) The ALJ also found that "the demands of [Wallace's] past relevant work history exceed the residual functional capacity." (*Id.*) The ALJ primarily relied on the clinical report by Dr. Rothbaum, which was not submitted to Defendant for its review.

### D.    Defendant's Second Termination of Benefits

Hartford sent Wallace an annual review letter on March 3, 2021, along with an information release authorization and other forms to complete and return. (Doc. 25-5 at 100.) Wallace returned the signed authorization to Hartford on April 8, 2021. (Doc. 25-11 at 154.) In accordance with the authorization, Hartford requested updated medical records from Wallace's healthcare providers. (Doc. 25-3 at 2–28.) Hartford received updated medical records from five medical providers, but none described any R&Ls nor provided an APS along with their records. (Doc. 25-11 at 23–29, 68–146, 184–99.) Hartford's review found that most of the examinations within these records revealed normal functionality. (Doc. 28 at 9.)

Dr. Marsh responded to the medical records request on June 9, 2021, with an opinion letter in support of Wallace's continued diagnosis, but did not provide any medical records for review. (Doc. 25-11 at 14.) Dr. Tecaya responded with an opinion letter in favor of Wallace's continued diagnosis, but also failed to provide any objective medical reports for review. (Doc. 25-9 at 5.) Hartford attempted to communicate with Drs. Marsh and Tecaya

in October 2021 to clarify the information they provided but received no responses. (Doc. 25-5 at 33–46; Doc. 25-2 at 68–70.) In turn, Hartford hired a fourth outside vendor to coordinate an IME, which was completed by Dr. Brian McCrary, a board-certified occupational medicine doctor, on November 16, 2021. (Doc. 25-10 at 75–82.) Wallace was accompanied to the IME by Gretchen Van Maren, a retired anesthesiologist. (Doc. 25-10 at 75.) At the time of Dr. McCrary's examination, Hartford had not received a medical record from Dr. Marsh since October 2019, nor from Dr. Tecaya since February 2018. (Doc. 25-8 at 106–08; Doc. 26-9 at 120–23.) Dr. McCrary's exam revealed no restrictions or impairment. (Doc. 25-10 at 77–79.) Hartford provided Wallace's doctors with the IME results and asked for a response. (Doc. 25-5 at 21–22, 25–26.) Wallace's doctors did not immediately respond to the IME results. (Doc. 25-2 at 45–48.)

At that point, the only support Wallace had from medical professionals for the review period beginning March 3, 2021, were the letters from Dr. Marsh, dated June 9, 2021, and Dr. Tecaya, dated May 7, 2021. (*Id*. at 16–18.) The remaining materials either indicated that Wallace's function was in a normal limit, did not indicate information relevant to a determination, or provided information outside the relevant time frame for the determination. (*Id*.) Based on the information provided by Wallace and gathered independently, Hartford obtained another EAR which indicated Wallace could perform his own occupation. (Doc. 25-10 at 62–65.) Hartford made the determination that Wallace could perform light work and, therefore, could qualify for positions under the Any Occupation standard that would pay more than 50% of his Indexed Pre-Disability Earnings. (25-2 at 25.) Hartford terminated Wallace's claim by letter, stating that he did not meet the policy definition of "Disability" for beyond January 4, 2022. (Doc 25-5 at 14–20.)

### E.    Wallace Appeals Termination of Benefits.

Wallace appealed Hartford's termination of his claim on August 8, 2022. (Doc 25-7 at 25–38.) Hartford hired a third-party vendor to conduct a tri-morbid review from three independent board-certified doctors: Drs. Vincent, Kretzmann, and Jasso. (Doc. 25-6 at 134–46; Doc. 25-7 at 2–19.) Each physician reviewed the file compiled by Hartford,

including new materials submitted on appeal, and concluded that there was no basis for R&Ls or cognitive impairment. (Doc. 25-7 at 16.)

Hartford sent the report from the tri-morbid review to Wallace's counsel on September 8, 2022. (Doc. 25-5 at 8–9.) Wallace's counsel responded with a letter dated September 23, 2022, disputing various portions of the materials and providing an additional opinion letter from Dr. Marsh. (Doc. 25-6 at 89–93.) Dr. Marsh's letter stated that the medications prescribed to Wallace could have side effects and that it was his opinion Wallace was unable to work. (*Id*. at 92–93.) Hartford provided the letter to the reviewing doctors. (*Id.* at 30–32, 35–36, 41–42.) The reviewing doctors issued an addendum in response to Dr. Marsh's letter, confirming their initial findings. (*Id*. at 30–32.) Hartford provided the addenda to Wallace on October 12, 2022 for comment. (Doc. 25-5 at 5–6.) Wallace declined. (Doc. 25-6 at 26.) Hartford ultimately found that there was not enough evidence to continue the payment of benefits to Wallace, and the final determination on appeal was issued to Wallace on October 27, 2022. (Doc. 25-4 at 121–33; Doc. 25-5 at 2–4.) Wallace then initiated the instant lawsuit.

## IV. Discussion

In his Motion for Summary Judgment, Wallace argues that Hartford acted with conflict of interest and bias beyond what characterizes a full and fair review, abused its discretion in terminating his LTD benefits, and asks the Court to find that he is disabled and rule that benefits be reinstated. (Doc. 29 at 21.) Hartford argues that Wallace has failed to meet his burden of proving entitlement to LTD benefits under any standard of review and asks the Court to find that Hartford did not abuse its discretion in terminating Wallace's benefits. (Doc. 28 at 18.) For the reasons set forth in this Order, the Court concludes that Hartford did not abuse its discretion in determining that Wallace did not meet his burden of proof under the Plan's "Any Occupation" standard.

### A.    Standard of Review

The Court will review Hartford's decision to terminate benefits under the "abuse of discretion" standard. The default standard of review for a court reviewing a decision by the

administrator of a plan governed by ERISA is de novo. *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 112 (1989). However, "if the plan *does* confer discretionary authority as a matter of contractual agreement, then the standard of review shifts to abuse of discretion." *Abatie v. Alta Health & Life Ins. Co.*, 458 F.3d 955, 963 (9th Cir. 2006) (emphasis in original). A plan administrator abuses its discretion if the decision to terminate benefits was "(1) illogical; (2) implausible; or (3) without support in inferences that may be drawn from the facts in the record." *Salomaa v. Honda Long Term Disability Plan*, 642 F.3d 666, 676 (9th Cir. 2011) (quoting *U.S. v. Hinkson*, 585 F.3d 1247, 1262 (9th Cir. 2009) (en banc)). Under this standard, the Court does not decide whether the plan administrator made the correct decision to terminate benefits, but whether such decision was reasonable. *Id.* at 674–75. The Court must consider all relevant circumstances and factors. *Pac. Shores Hosp. v. United Behav. Health*, 764 F.3d 1030, 1041 (9th Cir. 2014).

Here, the Plan expressly gives Hartford the authority to determine when a participant has established the required "Proof of Loss" to be entitled to a Plan benefit. (Doc. 26-11 at 18.) As such the Plan gives Hartford discretionary authority, and the Court will review whether Hartford abused its discretion in its decision to terminate benefits to Wallace. *See Abatie*, 458 F.3d at 963.

## B.    Conflict of Interest

Where "the entity that administers the plan, such as an employer or insurance company, both determines whether an employee is eligible for benefits and pays benefits out of its own pocket…this dual role creates a conflict of interest." *Metro Life Ins. Co. v. Glenn*, 554 U.S. 105, 108 (2008). "While not altering the standard of review itself, the existence of a conflict of interest is a factor to be considered in determining whether a plan administrator has abused its discretion." *Stephan v. Unum Life Ins. Co. of Am.*, 697 F.3d 917, 929 (9th Cir. 2012) (citing *Glenn*, 554 U.S. at 108). "[T]he significance of the factor will depend upon the circumstances of the particular case," *Glenn,* 554 U.S. at 108, and "the likelihood that the conflict impacted the administrator's decisionmaking," *Stephan*, 697 F.3d at 929. Where evidence of bias exists, "the conflict 'should prove more

1    important,'" but where "an insurer has 'taken active steps to reduce potential bias and
2    promote accuracy,' the conflict may be given minimal weight." *Id.* at 929 (quoting *Glenn*,
3    544 U.S. at 117). Wallace has the initial burden to present material, probative evidence
4    tending to show Hartford's self interest influenced its decision to terminate benefits, which
5    Hartford may rebut. *See Muniz v. Amec Constr. Mgmt., Inc.*, 623 F.3d 1290, 1295 (9th Cir.
6    2010) (citing *Tremain v. Bell Indus., Inc.*, 196 F.3d 970, 976 (9th Cir. 1999)); *Demer v.*
7    *IBM Corp. LTD Plan*, 835 F.3d 893, 902 (9th Cir. 2016).

8        Here, Hartford both administers the Plan and pays benefits to the participants. Thus,
9    Hartford has a structural conflict of interest, and the Court will apply a higher degree of
10   skepticism when determining whether Hartford abused its discretion in terminating
11   Wallace's LTD benefits. In its determination, the Court is mindful that, because "the Plan
12   is at the center of ERISA," administrators have a duty to all beneficiaries to preserve plan
13   assets and must strictly enforce the plan's proof requirements to approve only proven
14   claims per the plan's terms. *Conkright v. Frommert*, 559 U.S. 506, 520 (2010); *see*
15   *Barnhart v. UNUM Life Ins. Co. of Am.*, 179 F.3d 583, 589 (8th Cir. 1999) ("[An
16   administrator] breaches its duty to all claimants as a fiduciary of the benefit funds when it
17   grants claims to unqualified claimants.").

18/19        **1.    Evidence of Bias Affecting the Conflict of Interest Factor and the Reasonableness of Hartford's Determination**

20        Wallace argues nine actions show that Hartford "acted with a conflict of interest and
21   bias well beyond what characterizes a full and fair review." (Doc. 29 at 9.) Simultaneously,
22   Wallace appears to argue these same nine actions show Hartford abused its discretion when
23   it terminated his benefits. (*Id.* at 10–21.) The Court considers each of Plaintiff's allegations
24   in turn and considers both: (1) whether the evidence shows bias requiring the Court to view
25   Hartford's conflict of interest with heightened skepticism; and (2) whether the evidence
26   shows Hartford abused its discretion, i.e., whether Hartford's decision was unreasonable.
27   //
28   //

### a.    Consideration of the ALJ's Findings

Wallace asserts that Hartford failed to address the ALJ's detailed findings and discussion of witnesses and evidence, gave no weight to the ALJ's credibility determinations, and failed to address the ALJ's reasons for relying on consultive examiner Jerome Rothbaum. (*Id.* at 11.) Wallace states that none of Hartford's reviewers were aware of Dr. Rothbaum's work or the ALJ's high opinion of his conclusions. (*Id.*) Wallace asserts that Dr. McCrary could not have been aware of the ALJ's findings and the evidence providing the foundation for those findings because Dr. McCrary wrote that he was not provided records more recent than 2019. (*Id.*)

Hartford reviewed the materials that were provided by Wallace, which included the ALJ's findings and award, but not the underlying medical evidence. (*Id.*) Wallace did not provide Hartford with his SSDI file or Dr. Rothbaum's report. (Doc. 32 at 14–15.) And, importantly, the SSA issued its award based on an October 2020 hearing. (*Id.* at 14.) As of that date, Hartford was still paying Wallace benefits; Dr. McCrary had not yet performed an IME; and the tri-morbid independent medical reviews/addenda had not been created. (*Id.*) The ALJ decision does not reference Dr. Tsandis's neuropsychological testing, any of the independent medical reviews that existed prior to October 2020, or the records from Ms. Thiem. *See Austin-Conrad v. Reliance Standard Life Ins. Co.*, No. 14-CV-00127, 2016 WL 5400366, at *8 (W.D. Ky. Sept. 26, 2016) (stating plan administrator may discount SSA decision based on outdated medical records and records that had not been updated). Moreover, according to the SSA decision, Dr. Rothbaum determined that Wallace could perform light-duty work with some mild restrictions. (Doc. 25-10 at 12.) The ALJ also found that the Wallace "has the residual capacity to perform light work." (*Id.* at 11–12.)

While plan administrators cannot arbitrarily disregard an SSA determination of disability, they are also not bound to the ALJ's ruling. *Montour v. Hartford Life & Acc. Ins. Co.*, 588 F.3d 623, 635 (9th Cir. 2009). "Ordinarily, a proper acknowledgment of a contrary SSA disability determination would entail comparing and contrasting not just the definitions employed but also the medical evidence upon which the decisionmakers relied."

*Id.* at 636. Here, while the ALJ adjudicated Wallace "disabled" for the purposes of SSDI, the underlying findings align with those of Hartford—that Wallace can undertake light work. (Doc. 25-5 at 18.) In fact, the R&Ls as determined by Hartford appear to be in line with the determination of the ALJ.

The record does not show that Hartford ignored or disregarded the findings of the ALJ without basis. Further, Wallace has failed to show that the findings of the ALJ, when applied to the "Any Occupation" standard of the ERISA-governed Plan, would have necessarily produced a different determination. Therefore, Hartford's consideration of the ALJ's findings was not an abuse of discretion, nor does it show that Hartford acted with bias.

### b.    Consideration of Medication Side Effects

Wallace has not submitted medical evidence that he suffered from medication side effects; he relies on observational statements from medical providers and lay persons. (Doc. 29 at 11–12.) The court in *Demer* held that, based on the undisputed record, administrators may not attack the credibility of subjective testimony relating to medication side-effects without specific reasons supported by the record. 835 F.3d at 905. In *Demer*, it was undisputed that: (1) the claimant was taking "powerful narcotic and other medications, prescribed in attempts to manage his pain"; (2) the medications were medically necessary; and (3) the prescribed medications have known side effects. *Id.* at 904–05.

Hartford argues that while Wallace was prescribed certain medications that may cause side effects, there is no medical evidence that Wallace was in fact taking those medications either during the review period or beyond January 4, 2022. (Doc. 32 at 8.) Hartford asserts that because Plaintiff did not provide medical records after the beginning of the review period on March 21, 2021, there is no record to show what medications he was taking at the time, or if he was on any of the medications reviewed by his paid expert, Professor Ronaldson, beyond the termination date of January 4, 2022. (*Id.*) In the records of Wallace's pain management provider, from July 27, 2020 through April 12, 2021,

1    Wallace denied having any medication side effects. (Doc. 25-11 at 185, 187, 189, 191, 193,

2    195, 197, 199.) Further, Wallace did not report to Dr. McCrary during the IME that he was

3    experiencing any side-effects from his medication. (Doc. 25-10 at 75–76, 78–79.)

4         Wallace argues the report of the paid expert, Professor Ronaldson, is proof that the

5    medications prescribed to him have cognitively impairing side-effects. (Doc. 29 at 11–12.)

6    Hartford does not dispute that there are side-effects associated with the medications

7    reviewed by Professor Ronaldson, but it does dispute that there is any evidence proving

8    that Wallace was taking those medications or that he had any of the possible side-effects

9    during the review period beginning March 21, 2021 or beyond the January 4, 2022

10   termination date. (Doc. 32 at 8.) Professor Ronaldson states that the medications listed are

11   "likely to" or "can" produce impaired cognitive performance. (Doc. 25-9 at 78.) But

12   Professor Ronaldson does not state that these drugs always cause those side-effects, nor

13   does Ronaldson opine on whether Wallace suffers from those side-effects. Plaintiffs further

14   rely on the September 22, 2022 letter from Dr. Marsh stating that there is a certainty those

15   medications will have side-effects. (Doc. 25-6 at 72.) Dr. Marsh does not describe what

16   side-effects Wallace is currently suffering, nor any that he had specifically suffered in the

17   past, but simply directs the reader to the website for the drug Lyrica as an example of "how

18   one medication *can* affect a person's mental and physical condition." (*Id*. at 72–73

19   (emphasis added).) Further, Plaintiff points to a November 13, 2019 report by Marcy

20   Tigerman, an occupational rehabilitation consultant. (Doc. 29 at 12.) Tigerman is not a

21   doctor, and as such, her review of medical records does not constitute a diagnosis. (Doc.

22   25-13 at 54.) Further, Tigerman explicitly states that her scope of practice is to "quantify

23   the extent of movement and functionality to occupational examples." (*Id*.) Tigerman did

24   not physically examine Wallace but conducted an interview. (*Id*.) While Tigerman opines

25   on the likelihood of side-effects of the medication, Tigerman does not directly state that

26   she witnessed cognitive impairment as Plaintiff suggests.

27        The only other evidence to which Plaintiff points falls prior to the start of the review

28   period beginning March 21, 2021, and are likely materials from the Plaintiff's previous

1    appeal, namely, office notes by Dr. Selz dated November 2018 and letters from Dr. Tecaya

2    dated April and November 2018.

3          Accordingly, because (1) the record is disputed as to whether Wallace was in fact

4    taking the listed and analyzed medications, a burden of proof for which he is responsible,

5    and (2) Hartford points to specific evidence in the record as the basis for discrediting

6    Plaintiff's subjective side-effect testimony, the Court finds that Plaintiff has failed to show

7    that Hartford acted with bias or abused its discretion.

8                 **c.**      **Failure to Provide Reviewers with Evidence**

9          Plaintiff argues that Hartford abused its discretion by not providing all relevant

10   evidence to its reviewers. (Doc. 29 at 12–13.) Hartford requested medical records,

11   treatment notes, or test results from Plaintiff on at least seven occasions through written

12   requests to Plaintiff, Plaintiff's counsel, and Plaintiff's medical providers. (Doc. 25-8 at

13   110; Doc. 25-5 at 55, 60–64, 74, 79, 81–82, 89–91.) When Hartford thought that the

14   documentation provided to them was not of the quality required to complete a good-faith

15   review of Plaintiff's claim, Hartford followed up with Plaintiff, Plaintiff's counsel, or

16   Plaintiff's medical providers. (Doc. 25-8 at 110.) Under the terms of the Plan, Plaintiff has

17   the responsibility and burden to provide Hartford with the requisite documentation of proof

18   of loss. (Doc. 26-11 at 9.) The most recent medical record provided to Hartford that

19   supported Plaintiff's position is an October 23, 2019 office visit note from Dr. Marsh. (Doc.

20   32 at 2; Doc. 25-8 at 87–89.)

21        Plaintiff specifically argues that Hartford did not supply Dr. McCrary or its other

22   reviewers with Dr. Rothbaum's report, the ALJ's findings, or Dr. Marsh's October 5, 2021

23   letter. (Doc. 29 at 12–13.) As discussed above, Plaintiff has never provided Dr. Rothbaum's

24   report to Hartford. Further, the ALJ's SSDI determination is not a medical record from

25   which a reviewing doctor, such as Dr. McCrary, would be able to reasonably make any

26   medical judgments. The ALJ findings rely heavily on Dr. Rothbaum's medical report,

27   which again, was not provided to either Hartford or this Court for review. Dr. Marsh's

28   October 5, 2021 letter, which the Plaintiff asserts is a "report with extensive handwritten

opinions," is a six-page form letter generated by Hartford requesting additional information from Dr. Marsh and providing areas for handwritten response. (Doc. 25-8 at 110–15.) On the front page of that letter, it is requested: "please included [sic] any recent office notes or testing with return of this completed form." (*Id*. at 110.) Dr. Marsh references numerous objective tests that are "in your possession," as well as the reports of five other medical providers (*Id*. at 112, 114.) However, Dr. Marsh did not provide office notes, test results, nor other objective medical reports along with this response letter. As discussed previously, Hartford did not have any objective medical reports, test results, or office notes from Dr. Marsh during the review period beginning March 21, 2021, and many of the reports from other service providers did not support Wallace's claimed R&Ls. It is unclear to the Court, and Plaintiff fails to explain, how Dr. McCrary would have been able to rely on these handwritten notes to make a determination during the IME.

As such, Plaintiff has failed to show that Hartford acted with bias or abused its discretion.[4]

### d.    Requiring "Objective" Medical Evidence

Plaintiff argues that Hartford set an unrealistic and unobtainable standard for the objective medical evidence that they would require for Plaintiff to meet his burden of proof in submitting his claim. (Doc. 29 at 13–14.)

Courts have found that when a plan administrator has required overly objective testing or clinical data from plan recipients to prove their disability, the administrator has abused its discretion. *See Montour*, 588 F.3d 623; *see also Salomaa*, 642 F.3d at 676. Plaintiff cites two cases in support, *Montour* and *Kennedy v. Lilly Extended Disability Plan*, 856 F.3d 1136 (7th Cir. 2017).

---

[4]  Plaintiff also argues Hartford should have provided its reviewers with letters from his attorney and another attorney, Tamara Crockett, alleging Dr. McCrary performs IMEs in a biased manner, Ms. Van Maren's declaration that McCrary's examination of Wallace did not conform to the usual standard of care, and the results of surveillance by Hartford's private investigators. (Doc. 29 at 13.) Plaintiff does not explain how this information would be relevant for Hartford's reviewers to assess the medical evidence and the medical validity of Dr. McCrary's examination, nor does he cite to any authority suggesting that Hartford had a responsibility to provide such information to its reviewers. This evidence, and Hartford's own consideration of it, is addressed below. *See* discussion *supra* Sections IV.B.1.h–i.

In *Montour*, the court stated that "it would probably be unreasonable for Hartford to require Montour to produce objective proof of his pain level." 588 F.3d at 635. The record here shows that Hartford did not ask for specific objective findings of Wallace's pain level, but simply requested some objective medical records or test results that supported Wallace's R&Ls, rather than the multiple subjective opinion letters which were provided by Plaintiff. (Doc. 25-8 at 110; Doc. 25-11 at 38, 53.)

In *Kennedy*, the court pointed out that it is error to demand laboratory data to credit the symptoms of fibromyalgia. 856 F.3d at 1139. There is no evidence in the record that Hartford made requests for lab data regarding Wallace's fibromyalgia symptoms. Rather, Hartford requested medical records, contemporaneous office visit notes, or APSs, which they were not provided with.

As such, Plaintiff fails to show Hartford acted with bias, abused its discretion, or that its requests for objective medical evidence were unreasonable in this particular case.

### e.    Refusal to Credit Treating Physicians

Plaintiff argues that Defendant did not give proper weight to the opinion of Plaintiff's treating physicians, including Wallace's PCP, Dr. Marsh. (Doc. 29 at 14–16.) Plan administrators are not required to give a plan recipient's PCP special credit, which is precisely what the Plaintiff is arguing for here. *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 834 (2003). "Plan administrators, of course, may not arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of a treating physician. But . . . courts have no warrant to require administrators automatically to accord special weight to the opinions of a claimant's physician; nor may courts impose on plan administrators a discrete burden of explanation when they credit reliable evidence that conflicts with a treating physician's evaluation." *Id*.

Plaintiff argues that Dr. McCrary did not give proper weight to Dr. Marsh and Dr. Tecaya's medical notes and opinions. (Doc. 29 at 14.) Dr. McCrary is not the Plan administrator, and therefore, the weight given by Dr. McCrary to those materials borders on irrelevant when determining if Hartford arbitrarily refused to credit Drs. Marsh or

Tecaya.

Further, materials submitted for Hartford's review from Dr. Marsh during the review period beginning March 21, 2021 included only three items: a June 9, 2021 opinion letter; the handwritten notes on the form letter dated October 5, 2021; and Dr. Marsh's September 13, 2022 rebuttal letter. (Doc. 39-1 at 7–8.) None of those materials are considered objective medical records under the Plan, and even when asked, neither Wallace nor his treating physicians supplied Hartford with records to support Dr. Marsh or Dr. Tecaya's opinions. (Doc. 25-8 at 110; Doc. 25-5 at 55, 60–64, 74, 79, 81–82, 89–91.) "Nothing in the Act . . . suggests that plan administrators must accord special deference to the opinions of treating physicians. Nor does the Act impose a heightened burden of explanation on administrators when they reject a treating physician's opinion." *Jordan v. Northrop Grumman Corp. Welfare Benefit Plan*, 370 F.3d 869, 878–79 (9th Cir. 2004) (citing *Nord*, 538 U.S. at 831), *abrogated on other grounds by Abatie*, 458 F.3d 955.

As such the Court finds that the Plaintiff has failed to show that Hartford acted with bias or abused its discretion by crediting objective medical evidence in the record that conflicted with Plaintiff's treating physicians' conclusory opinion letters.

### f.    Consideration of Professionals Conscious of Dangers from Mining Fatigue

Plaintiff argues that Hartford abused its discretion by "ignor[ing] all professionals conscious of dangers to human life from mining engineer fatigue." (Doc. 29 at 16–17.) In doing so, Plaintiff ignores the standard proscribed by the Plan under which Hartford is required to review his disability, namely the "Any Occupation" standard. (*See id.*) Plaintiff argues that the conditions of working as a mining engineer specifically at Freeport, including their memorandum on controlled substances, preclude him from being a mining engineer in the wider work force. (*Id.*) Even his occupational consultant addresses only the conditions at Freeport: "he was required to walk and climb on uneven surfaces . . . that is why his employer had a policy prohibiting any controlled substances." (*Id.* at 16.) Plaintiff does not make any allegations that the conditions present as a mining engineer at Freeport

are standard throughout the industry, nor does he introduce any evidence that he would be unable to perform this occupation at another mining company in the national economy. Plaintiff does not cite any case law to support his argument. As such, Plaintiff has failed to show that Defendant abused its discretion or acted with bias.

g.    **Consideration of Treating Physician and Lay Witness Opinions**

Plaintiff argues that Defendant abused its discretion by ignoring the opinion of his treating physician and other lay witnesses. (Doc. 29 at 17–18.) Specifically, Plaintiff asserts that Hartford abused its discretion by concluding that "the basis for granting benefits for many years is no longer relevant once an investigation begins." (*Id.* at 18.) Plaintiff cites two cases to support this assertion, *Kurth v. Hartford Life & Acc. Ins. Co.*, 845 F. Supp. 2d 1087 (C.D. Cal. 2012) and *Hertz v. Hartford Life & Acc. Ins. Co.*, 991 F. Supp. 2d 1121 (D. Nev. 2014). In *Kurth*, the district court found that Hartford failed to point to specific parts of the medical record to refute a doctor's prior diagnosis, and failed to adequately explain why that prior diagnosis was "sufficient for it to grant benefits for a time, and yet completely unacceptable once the investigation began." 845 F. Supp. 2d at 1101. Here, Hartford has pointed to objective medical evidence that sufficiently refutes the prior diagnosis of Wallace being "totally disabled." There is no evidence that Hartford relied on any subjective evidence to grant Wallace his LTD benefits previously, nor that Hartford relied on that same evidence to terminate his LTD benefits in the immediate case. Further, the ALJ determination on which Wallace consistently relies, also found residual physical capacity, indicating that he is not "totally disabled."

In *Hertz*, the district court found that Hartford had previously determined that the participant was disabled by relying on the same non-objective evidence that it then rejected. 991 F. Supp. 2d at 1141. This is also not the case here, as Hartford previously relied on objective medical evidence to determine that Wallace was disabled, and then in turn, relied on objective medical evidence to determine that Wallace was not disabled. Accordingly, Plaintiff has failed to show that Hartford abused its discretion or acted with bias.

//

### h. Failure to Share Results of Surveillance

Plaintiff argues that Hartford abused its discretion by not disclosing video recordings gathered by third-party private investigators in 2018 and 2021. Plaintiff argues that Hartford abused its discretion by not providing the 2021 surveillance videos to their medical reviewers and wrongfully withholding the information. (Doc. 29 at 18–19.) ERISA regulations require that on the appeal of an adverse determination, the administrator shall provide the claimant, "upon request and free of charge, reasonable access to, and copies of, all documents, records, and other information relevant to the claimant's claim for benefits." 29 C.F.R. § 2560.503-1(h)(iii). Relevant information includes a document, record, or other information which "[w]as submitted, considered, or generated in the course of making the benefit determination, without regard to whether such document, record, or other information was relied upon in making the determination." *Id.* § 2560.503-1(m)(8)(ii).

The surveillance from 2018 is not relevant because it occurred years before the current investigation. *See id.* § 2560.503-1(m)(8); (Doc. 29 at 18). However, the result of the August 2021 surveillance was seemingly generated during the course of the current benefit determination, and therefore, it is relevant under the regulations. If Wallace requested the record, Hartford would have abused its discretion by not supplying the record to him. However, the only support in the record evidencing the 2021 surveillance is an invoice dated August 18, 2021. (Doc. 25-11 at 5.) There is no report in the record associated with that surveillance. Further, there is no request for production of that report by Wallace in the record, nor does Plaintiff argue that he so requested it. Plaintiff cites no caselaw or statute which requires Hartford to produce a surveillance report to medical reviewers when other objective medical evidence is available. *See Hertz*, 991 F. Supp. 2d at 1141 (finding Hartford abused its discretion by relying on surveillance video *instead of* conducting an IME as requested by the participant).

Accordingly, the Court finds that Hartford did not abuse its discretion or act with bias by not providing the video footage to the medical reviewers.

### i. Bias of Hartford's Medical Experts

Plaintiff argues that Hartford abused its discretion by failing to prevent bias in its determination. (Doc. 29 at 19–21.) First, Plaintiff alleges that the Defendant hired a biased doctor, Dr. McCrary, to conduct the IME. (*Id*. at 19.) Plaintiff points to the fact that Dr. McCrary did not have any records for the two years prior to the IME. (*Id*.) As discussed above, Plaintiff did not supply Hartford with any medical records for the two years preceding the IME. Next, Plaintiff asserts that Hartford did not meaningfully respond to his hired observer, retired anesthesiologist Gretchen Van Maren's, critique of Dr. McCrary's IME. (*Id*.) Hartford did respond, by stating Van Maren's report was an "attempt to discredit any valid medical opinion which doesn't align with your position rather than argue merits of the specific current medical evidence." (Doc. 25-4 at 131.) Plaintiff does not explain why he hired a doctor to attack Hartford's medical evidence, rather than to perform unbiased testing to produce contradictory medical evidence which would support his position.

Next, Plaintiff argues that because the testimonies of Drs. McCrary and Tsandis were previously rejected in a different case, this Court should also be required to reject their testimonies. (Doc. 29 at 20 (citing *Brown v. Life Ins. Co. of N. Am.*, No. CV-16-00162-TUC-JAS, 2018 WL 748288 (D. Ariz. Jan. 19, 2018)).) In *Brown*, the court rejected the testimonies of all of the privately hired doctors in that case because it found the records and testimony of the participant's doctors more credible, and because the private doctors were being compensated by the insurance company. 2018 WL 748288, at *3. Here, it is Wallace's burden to produce evidence of a financial conflict sufficient to warrant a degree of skepticism. *Demer*, 835 F.3d at 902. As evidence, Wallace submits two unsworn statements from attorneys, including the attorney currently representing him in this case, to show that Dr. McCrary has acted with bias in the past. (Doc. 25-7 at 96, 108.) Plaintiff further contends that Hartford refused to provide a history of using Dr. McCrary. (Doc. 29 at 20.) Plaintiff points to his requests for production of such documents, not to evidence that Hartford refused to supply them. (Doc. 25-6 at 71; Doc. 25-10 at 58.) Further, Plaintiff

alleges Dr. Tsandis only finds a claimant able to work. (Doc. 29 at 20.) To support this assertion, Plaintiff relies on an unsworn letter that his attorney wrote in 2019 during Wallace's previous appeal. (Doc. 25-7 at 131–34.)

As Plaintiff is unable to provide specific evidence of the frequency of reviews or any significant dollar amount earned by Dr. McCrary or Dr. Tsandis, Plaintiff is unable to show that Hartford abused its discretion. *Demer*, 835 F.3d at 903. However, "such lack of evidence does not mean there is *no* conflict of interest." *Id*. Because the outside doctors retained by Hartford may have financial incentive to produce results in favor of Hartford, an increased level of skepticism is required when reviewing their determinations in this case. *Id*. at 904.

Next Plaintiff argues that Dr. Tsandis and Hartford bullied him when he attempted to submit an altered authorization. (Doc. 29 at 20.) Plaintiff does not cite any caselaw or statute to show that he is entitled to submit an altered authorization, or that Hartford otherwise abused its discretion by stating it would not accept the altered authorization. Plaintiff also does not cite to the record where the alleged "bullying" occurred.

Finally, Plaintiff alleges that Hartford's determination process was biased when the doctors in the final tri-morbid review misrepresented the opinions of Dr. Marsh. (*Id.*) Plaintiff does not specifically detail what those misrepresentations were but directs the Court to Dr. Marsh's response to the report dated September 13, 2022. (Doc. 25-6 at 69–73.) This report also does not specifically describe any misrepresentations, other than the assumption that Dr. Marsh was no longer treating Wallace, likely because Hartford had not been supplied with any medical record produced by Dr. Marsh since 2019.

Accordingly, the evidence of Hartford's bias does not directly convince the Court that Hartford abused its discretion, but such bias should be taken into account when heightening the skepticism applied to Hartford due to its inherent conflict of interest, and the Court will adjust its deference accordingly. *Salomaa*, 642 F.3d at 674–75.

//

//

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**C.    Hartford Did Not Abuse its Discretion When Terminating Benefits for Lack of Proof Provided.**

The Court finds that Hartford did not abuse its discretion in terminating Wallace's LTD benefits under the terms of the Plan. Under the abuse of discretion standard, an administrator's interpretation of the Plan will not be disturbed if reasonable. *Conkright v.* 559 U.S. at 521. To find that an administrator abused its discretion, its decision must be either: "(1) illogical, (2) implausible, or (3) without support in inferences that may be drawn from the facts in the record." *Salomaa*, 642 F.3d at 676. Hartford's structural conflict of interest requires the Court to apply a higher degree of skepticism to Hartford's decision to terminate. *See id*. However, for the reasons discussed above, the Court will give the conflict of interest factor only "minimal weight" in this case. *See Stephan*, 697 F.3d at 929. "In all abuse-of-discretion review, whether or not an administrator's conflict of interest is a factor, a reviewing court should consider all the circumstances before it . . . in assessing a denial of benefits under an ERISA plan." *Pac. Shores Hosp.*, 764 F.3d at 1042 (quoting *Abatie*, 458 F.3d at 968) (cleaned up).

The Plan unambiguously requires Wallace to furnish the proof of loss necessary for Hartford to establish that he is disabled on a continuing basis. (Doc. 26-11 at 9.) Further, the Plan dictates that the failure to provide these materials to Hartford is grounds for the termination of benefits. (*Id*.) Hartford's stated reason for terminating Plaintiff's LTD benefits, in its 16-page final determination letter dated October 27, 2022, is that "based on the weight of the medical, vocational and overall claim evidence; we find that your client does not meet the Any Occupation definition of Disability." (Doc. 25-5 at 4.) The October 27, 2022 letter goes on to outline the shortcomings of Plaintiff's evidence in great detail, as well as his failure to provide requested materials on multiple occasions. (Doc. 25-4 at 121–33; Doc. 25-5 at 2–4.)

Hartford's independent reviewers attempted on multiple occasions to communicate with Wallace's medical professionals for comment or further information, but these requests were often ignored. (Doc. 25–5 at 55, 60–64, 74, 79, 81–82, 89–98; Doc. 25-8 at 110.) When Wallace's benefits were terminated, Hartford gave Wallace an opportunity to

supply additional updated materials for review upon appeal, and Wallace did. (Doc. 25-4 at 122.) However, Wallace consistently relied on conclusory opinion letters from lay-persons and Drs. Marsh and Tecaya as proof of his disability and did not submit any further medical evidence or additional testing. (*See id.*) As such, it appears from the record that Hartford gave the Plaintiff every opportunity to submit additional evidence, clarify ambiguous materials, or otherwise explain discrepancies in the record. In other words, Hartford necessarily endeavored to give the Plaintiff a full and fair review of his disability and engage in "meaningful dialogue" between parties. *See Mooton v. Lockheed Med. Ben. Plan*, 110 F.3d 1461, 1463 (9th Cir. 1997).

Nothing in the record shows that Hartford's decision was "(1) illogical, (2) implausible, or (3) without support in inferences that may be drawn from the facts in the record." *See Salomaa*, 642 F.3d at 676. When Hartford found evidence to be lacking, it logically asked Plaintiff for clarification or additional materials. When Plaintiff failed to provide materials that adequately proved his disability, Hartford hired no less than five outside vendors to produce independent reports or undertake additional examinations of Wallace. As discussed above, Hartford's determination under the "Any Occupation" standard was not implausible. Plaintiff consistently failed to argue the correct standard and offered no evidence that the R&Ls prescribed to him were inconsistent with the position of mining engineer at companies other than Freeport, relying instead on generalized objections to perceived requirements of the occupation not contained in the EAR. Finally, Plaintiffs have failed to show that Hartford's determination was not supported by inferences in the record and have ultimately failed to show that Wallace's condition is inconsistent with his R&Ls or that those R&Ls are inconsistent with the occupation of mining engineer. Plaintiff points to his adjudication of disabled for the purposes of SSDI as proof he is entitled to LTD benefits under the Plan. However, Plaintiff ignores that those separate determinations are governed by different legal standards, that the ALJ's findings without an age-related adjustment are reasonably consistent with R&Ls proscribed to him by Hartford's investigation, and that he failed to supply Hartford with the underlying

medical reports relied on by the ALJ. Accordingly, Plaintiff has failed to show that Hartford abused its discretion in terminating his LTD benefits.

**V.    Conclusion**

For the foregoing reasons, the Court concludes Hartford's conflict of interest did not improperly motivate its decision to terminate Wallace's benefits, and Hartford did not otherwise abuse its discretion in terminating Wallace's LTD benefits.

Accordingly,

**IT IS ORDERED:**

1.    Plaintiff's Motion for Summary Judgment (Doc. 29) is **denied**.

2.    Defendant's Motion for Summary Judgment (Doc. 28) is **granted**. The Clerk of Court shall enter judgment accordingly and close this case.

Dated this 28th day of March, 2025.

_____

Jennifer G. Zipps

Chief United States District Judge